**MACK v. UNITED STATES et al.**

No. 1572.

United States District Court
D. Massachusetts.

May 12, 1952.

Stanley H. Rudman and Schneider, Reilly & Bean, all of Boston, Mass., for plaintiff.

George F. Garrity, U. S. Atty., E. O. Gourdin, Asst., Boston, Mass., for the United States.

T. H. Walsh, K. C. Parker (Parker, Coulter, Daley & White) all of Boston, Mass., for Gibbons Engineering & Machine Co.

McCARTHY, District Judge.

This libel was brought in admiralty under the Suits in Admiralty Act, Title 46 U.S.C.A. § 741 et seq., and the Public Vessels Act, Title 46 U.S.C.A. § 781 et seq. The libellant's employer, the Gibbons Engineering & Machine Co., Inc. of Boston was impleaded by the respondent United States of America, owner of the vessel "S.S. Plymouth". The following are the facts.

At all times material hereto the libellant Robert H. Mack, a resident of this District, was employed by the Respondent impleaded (hereinafter called Gibbons Engineering) as a rigger.

On October 28, 1946, the "S.S. Plymouth", owned by the respondent United States, was delivered at Boston by the Maritime Commission to the Sprague

Steamship Company under a standard form of general agency agreement. The vessel was moored at Berth #14, Castle Island, Boston, for repair work prior to its being towed away from this port.

On November 18, 1946, a "Job Order" (No. SSC–44–Bos: Resp. Exh. J) under Warship-Lumpsumrep Contract No. WSA 11656 was granted to and accepted by Gibbons Engineering covering four items of work. One item required the contractor to furnish labor and material to remove the contents of three lifeboats. The boats were to be turned over and lashed. The gear removed from the boats was to be tagged and stored in the forepeak of the ship. (Resp. Exh. I)

The work under this order was begun November 18, 1946. The boats were unloaded and the rations and gear taken from them were passed down from the boat deck to the main deck by a group of five men including the libellant and the rigger foreman (called the "snapper") John Gentile.

On November 21st at about 2:30 P.M. the group commenced the task of storing the gear in the forecastle. The libellant picked up five or six cans of rations and entered the forecastle through the door on the port side. He stepped over the riser, walked forward three or four feet, "tripped over something" and fell to the deck. "All sorts of stuff fell on" him. He felt a sharp pain in his right shin and screamed. John Gentile came in and aided in extricating the libellant from cans, coils of rope and wire surrounding him and on his body. Gentile also threw aside a long iron bar about ¼ of an inch thick and an inch or two in width. There was a loop of wire around Mack's right foot which he himself removed. The wire was about a quarter of an inch thick and was hooked onto a reel about two feet in diameter which was located just inside the forecastle to the right of the port door.

I find that the accident occurred in the following manner. Ship's stores had been stowed in the forecastle of the vessel by persons unknown prior to the 24th day of October 1946, when the respondent became its owner. The stores—cans of water, brooms, ropes, steel bars, etc.— were piled to the left and right of the door on the port side to a height of six feet or more, leaving what was described at the trial as a passageway between the piles leading forward.

From October 24, 1946, to the date of the accident the respondent kept watchmen aboard the vessel. They entered the forecastle on various occasions and were aware of its condition. No other person employed by the respondent went into the forecastle until the accident occurred.

Other employees of Gibbons Engineering had been in the forecastle prior to the date of the accident in connection with work under other Job Orders let to the respondent-impleaded by the United States. An electrician had "strung" a single-bulb light in the compartment about fifteen feet forward of the port door.

The stores which were piled in the forecastle were not made fast, lashed or held in by boards. The libellant was tripped by the loop of wire already described, which protruded from the stores, and the gear toppled over on him.

At the time that Mack entered the forecastle the temporary light was burning. The other source of light was from the doorway through which the libellant entered. When Mack stepped over the riser, a raised sill, his body cut off the daylight from behind him, and the fact that his arms were piled with gear prevented him from seeing the wire in his path.

Mack's right shin was pierced by a steel bar which fell from the stores to his right. He went out on the main deck and sat on a hatch cover until the other men stopped work at 4 P.M. The shin bled profusely for a short time, then the flow ceased. In the next few days the leg began to swell somewhat and became painful, but he did return to work.

On the fifth day after the accident, the progress of the wound having been unsatisfactory to him, the libellant showed his leg to the foreman of the respond-

ent-impleaded, Mr. Herman Grimstad. The latter told Mack to visit a doctor at a clinic. Mack did so. The doctor dressed the leg and expressed the opinion that a day or two might see an improvement in it.

The following morning the libellant's leg was greatly swollen and the pain was so severe that his wife took him in a taxi to the Carney Hospital. There he was attended by Doctor John J. Todd. The doctor's examination disclosed a "scraped" area on the lower right leg, measuring about five by two or three inches. In the center of it was a wound one inch by a half inch and about three-eights of an inch in depth. Infection had set in. The cellulitis extended through the entire lower leg and into the glands of the groin. The doctor stated that it would take anywhere from a day to a week for such a condition to occur, and that the wound could have been caused only by a blow.

A clotting of the deep veins in the libellant's right leg developed which necessitated a bilateral femoral vein ligation and extraction of the clots in the right leg. After that the patient developed circulatory disturbances in his legs. Lumbar blocks and a sympathectomy were performed. Hospitalization lasted about six weeks.

For the next six months the libellant was confined to bed except for short periods of sitting in a chair with feet elevated. He was then treated at the Pratt Diagnostic Clinic in Boston for hyperthyroidism for about a year.

Prior to the accident this man had no trouble with his legs. Since then he has suffered pain and swelling almost constantly. He has been and is still unable to stand for extended periods of time because of the swollen painful extremities. He is unable to walk appreciable distances. Circulation in the legs is badly impaired. He has reached an end result, is not employable and is permanently and totally disabled. The prognosis is, as one medical expert aptly described it, "dark".

There is no doubt that his present condition is due to the original injury which the libellant received on November 21, 1946.

At the time of the accident Mr. Mack was earning an average of $75 a week and was thirty-nine years of age. At the time of trial he was forty-four years and seven months old and had a life expectancy of twenty-five and one-half years.

The libellant received $6,650.00 as compensation under the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq. to January 1, 1952. To the present time he has incurred medical expenses in the amount of $2510.86, paid by the insurer under the Act.

The respondent owned the "S.S. Plymouth" from October 24, 1946, until the date of the accident. During that period no change was made in the forecastle of the vessel, by way of adding stores to those already in there, or shifting their location. A dangerous condition existed which was known to the respondent or of which the respondent should have been aware. Watchmen were kept on the vessel and entered the forecastle on many occasions, mostly during the daylight hours. One of them testified that he visited the paint locker which is in that portion of the compartment nearest the bow.

The respondent was in control of the premises on which the libellant and his companions were expected to work. This is admitted in the answers to interrogatories. Furthermore, under the Master Lump Sum Contract the Administrator (term used in contract) reserved the right to enter into contract with persons other than this contractor for work in addition to that covered by a job order awarded to this company, watchmen were kept aboard the vessel by the respondent, and the vessel was not berthed at a plant, wharf, dock or pier belonging to the contractor.

A servant of an employer, working upon the premises of the owner in the performance of work in which the owner has a financial or commercial interest, is upon the premises by virtue of an implied invitation of the owner. Adams v. George

Lawley & Son Corp., 314 Mass. 87, 89, 49 N.E.2d 244. The libellant was a business invitee. The duty was upon .the respondent to use reasonable care to keep the premises in a reasonably safe condition, or at least to warn the libellant against dangers which were unknown to him or not obvious to any ordinarily intelligent person and were known or in the exercise of reasonable care ought to have been known to the respondent. Kelley v. Goldberg, 288 Mass. 79, 192 N.E 513. There was, clearly, a breach of the duty owed to the libellant, by reason of which he sustained his damage.

The respondent placed a great deal of emphasis upon a particular interrogatory propounded to the libellant, and his answer to it. The question read: "9. In regard to the exact location on the ship where you were injured please state * * * (c) Whether you had ever been in that particular location on the ship on prior occasions and if so the dates and times and reasons why you were there at those times." The libellant's answer was "Yes. I had been there at various times during the three days I was aboard." When this answer was called to the attention of the libellant at the trial, he explained that he intended to convey the meaning that he had been on the forward section of the ship in the vicinity of the forecastle, since the gear which had been removed from the boats had been placed on the main deck in that area preparatory to its being stored in the compartment. The answer was given truthfully and I accept it as such.

While it has been somewhat difficult to reconcile conflicting testimony in connection with what really happened at the time of the accident to Mr. Mack, it is inescapably clear from an examination of respondent's Exhibit D that on the 2nd day of December 1946 there was a written report executed by the Gibbons Engineering & Machine Co. to the United States Employees' Compensation Commission in which in answer to question 18, to wit: Describe in full how alleged accident occurred or how employee was exposed to alleged hazards" the following was stated,— "While working on the fore-peak man (Robert Mack) tripped on loose wire causing man to cut shin on right leg.".

On the other hand, the finding is also required that the libellant was guilty of contributory negligence. He described himself as an experienced man around ships. He knew that a forecastle was used for the storage of gear and that wire was gear on board ship. He was carrying cans which came well up on his chest so that he could not see his own feet and he could see from the deck outside that the daylight did not extend far through the open door. He walked in, the first man, without any inquiry or instructions. This was not the conduct of the ordinary prudent person, and it contributed to cause his injury. I find that his negligence contributed to his injury to the extent of 20%, and, under the admiralty rule of comparative negligence, recovery will be reduced by one-fifth.

█ I find as a fact that there was no negligence on the part of the libellant's employer which contributed to cause the injury to the libellant. There is no evidence that Gibbons Engineering did anything to create the dangerous condition which caused the accident. Nor was there anything to suggest to the libellant's employer that there was a hidden danger. The respondent argued that the respondent-impleaded did not make a proper inspection of the premises, but, under these circumstances, Gibbons Engineering had a right to assume that the place where its men were working was safe. It would be unreasonable to expect the employer to make a detailed inspection of every portion of the vessel before allowing the men to work. The respondent has not carried its burden of proving negligence on the part of the respondent-impleaded.

█ Full compensation for the damages suffered by the libellant would require a finding in the amount of $85,000. Reducing this amount by 20% because of contributory negligence leaves him with an award of $68,000.

It is unnecessary, in view of the foregoing, to discuss the defenses of contribution and indemnity. The impleading petition is dismissed with costs.